Case number 24-5101 et al. Center for Biological Diversity et al. v. Lee M. Zeldin in his official capacity as Administrator for the U.S. Environmental Protection Agency et al. State of Florida and Florida Department of Environmental Protection et al. Ms. Jaffee, Florida-Balanced Crestapolis EPA et al. Mr. Street, Florida-Balanced Crestapolis State of Florida and Florida Department of Environmental Protection. Ms. Reichert, Florida-Balanced Crestapolis Center for Biological Diversity et al. Ms. Jaffee, Florida. May it please the Court, Rebecca Jaffee appearing on behalf of the United States. I'd like to reserve one minute of time for rebuttal. The District Court erred in holding that the Fish and Wildlife Service and EPA violated the Endangered Species Act and the Court should reverse. Fish and Wildlife Service and EPA complied with the Endangered Species Act in relying on a process-based approach called technical assistance to ensure that EPA's approval of Florida's State 404 permitting program would not jeopardize listed species. The agencies followed the approach that the Second Circuit upheld in cooling water intake and the District Court erred in rejecting that precedent. The approach here allowed the agencies both to support Congress's cooperative federalism goal of having states manage 404 permitting programs and also comply with the Endangered Species Act. It's important to understand the agency action at issue here was a one-time approval of Florida's application to assume the entire state in perpetuity. In that context, EPA and the Fish and Wildlife Service simply could not know all the permits in all the locations and all the potential species impacts forever. So the agencies relied on species protective guardrails built into Florida's program. I guess my question is from what you just said is you said they couldn't know that forever, but why doesn't that just mean you can't approve this under the Endangered Species Act? Because, Your Honor, the Endangered Species Act requires the agency to make certain, well, to look at all the data and to make certain findings about whether there's jeopardy or not and that's based on baselines and effects, etc. So if it is the case that this program doesn't allow you to make those findings, why isn't the answer that this program is not lawful? I have a couple answers to that, Your Honor. I think the first is that we have to read the statutes in a way to harmonize them, not to let the Endangered Species Act prohibit states from ever assuming 404 permitting authority, which is what we know Congress wanted. My question, though, is 404 permitting authority doesn't have to take into account the Endangered Species Act at this stage. There are two other states that do this and they don't have blanket take liability provisions under the Endangered Species Act. You can approve the 404 permit and just let the Endangered Species Act function independently. Your Honor, and I do have one more response I want to go back to with the previous question, but I think both of those states, I mean, every state designs its program itself and that's what Congress envisioned and those states are very different states with fewer listed species and also those approvals were quite a long time ago where I think lots of things operated differently. But the question under the Endangered Species Act is, will there be jeopardy? And the Fish and Wildlife Service absolutely has to look at the best available data. Here, the best available data was we don't know. We can't know. So we'll look- back to what we were just talking about. In terms of the Clean Water Act and the permitting authority, it doesn't speak to the Endangered Species Act. And what normally happens is you comply with Clean Water Act and you comply with the Endangered Species Act. And you don't have to have one process that tries to comply with both. You can be doing your permitting as a state, Florida can be doing the permitting, and then each permit might have to comply with Section 10 or, I mean, Section 7 goes with agency actions. These individual permits can't really come under Section 7. So it just seems that what Florida and the Fish and Wildlife Service were trying to do is to create a whole new thing. And I just don't see why everybody has to bend over backwards to allow them to do that when we have two independent statutory regimes which can very well function independently. That's the way they're intended to function. Your Honor, there is a federal action here, and that is EPA's approval of Florida's program. And EPA concluded that it had to consult under the Endangered Species Act. And that is because of the form of the program that they came up with. Because, correct me if I'm wrong, but under the Clean Water Act, for Florida to take this over, it doesn't mention the Endangered Species Act. It just has to have certain, I guess, the ability to have a permitting structure. It doesn't contemplate that the Endangered Species Act will be subsumed by this process that you come up with. Well, the Clean Water Act does require that EPA solicit and review comments from the Fish and Wildlife Service. And it does require that EPA ensure that any state... For individual permits, not for them to take over the permitting. That's not the way I read it, but perhaps I'm wrong. Your Honor, at Clean Water Act Section 404G2 and 3, the statute says, the administrator shall provide copies of such program to the Secretary of the Army Corps of Engineers and the Secretary of the Interior, acting through the Director of the United States Fish and Wildlife Service. 404G3 says... I'm sorry, but that's not part of the process of approving the state's ability to issue the permits instead of the Army Corps, is it? I believe it is, Your Honor. 404G is about state administration. And then 404H lists the criteria for EPA to approve a state's program. And it talks about taking into account... So I'm looking at 1344G, which is labeled state administration. Yes, Your Honor. And it says, the state may submit to the administrator a full and complete description of the program it proposes to establish and administer under state law or under an interstate compact. That doesn't talk about federal law at all, right? That's G1. Right, but G2, Your Honor? I'm just looking at G1. But I think the broader point, though, I think is that when a state wants to take over this permitting process under the Clean Water Act, it's not required at that stage to come up with a plan about how it's going to comply with the Endangered Species Act. And that's not what happened in the other two states. This is a novel thing that you're doing. Do you agree with that? No, Your Honor. I beg to differ. Florida's program is structured differently than the other two states. But 404G2 and G3 specifically refer to comments from the Fish and Wildlife Service. And then 404H, which has the criteria for approving a program, refers to taking into account the comments from the Fish and Wildlife Service. But also, EPA must assure that the state can assure compliance with the 404B1 guidelines. And one of the 404B1 guidelines is that no permit shall issue if it will cause jeopardy or adverse modification of critical habitat. So when EPA is approving a program, it has to have some way of saying, are we meeting these guidelines? Are we sure that the state can issue permits that won't cause jeopardy? It just seems to me that the default way to handle this, if we all agree that we have obligations under the Clean Water Act, we have obligations under the Endangered Species Act, is for, in each case, to make sure those obligations are met instead of, in advance, trying to come up with some program that gives blanket, just take liability insurance to anything that's coming later when you don't even know what the specifics are going to be. Your Honor, Florida has a right to design its program. And EPA has to review the program that presented to it and determine whether it complies with the criteria. And EPA is taking an action. I agree with all of that. I just think that the action they're taking doesn't seem to comply with Endangered Species Act. Well, I do agree with the court that they couldn't know all of the impacts. And so here, the best available data was relying on the process. A process where Florida will submit every single permit to the Fish and Wildlife Service to review. Fish and Wildlife Service will propose various protective conditions that Florida must incorporate into permits. Fish and Wildlife Service will specify take limits for every single permit. I don't want to take up all your time, although it looks like I have. I apologize to my colleagues. But I just have this final question. Do you think it would have been permissible for Florida and the Fish and Wildlife Service just to say, we approve this subject to later consultation that will definitely ensure that Section 7 of the Endangered Species Act will be fulfilled? I don't know, Your Honor. I don't know what the later consultation would be, because this is a one-time approval. The later consultation will be, Fish and Wildlife Service will be involved. And we will definitely ensure that the Endangered Species Act will be abided by. Your Honor, EPA is taking the action now. It's approving the action now. And that's hypothetical. Could Florida and the Fish and Wildlife Service come up with a plan where the plan was, we're going to approve 404 permitting by Florida now subject to a commitment, a firm promise that we will comply with the Endangered Species Act in a process later to be determined? I don't know, Your Honor. And I think there'd be a lot of questions about, what is this process later to be determined? So here, they laid out the process. And the process doesn't specifically require compliance with each of the terms of the Endangered Species Act. It's basically saying, we promise that this is all going to be fine. So I think that's exactly what happened in this case. It's very similar to my hypothetical. I beg to differ, Your Honor. I don't think the process is sort of a, you know, it'll be fine. Don't worry about it. It's a very detailed, there are memoranda of agreement. Florida has codified the process in its regulations, in its 404 program handbook. There are... But there's no enforcement mechanism for the Endangered Species Act. They will consult. And the blanket take liability applies no matter what the result is of that consultation. I beg to differ, Your Honor. If plaintiffs, for example, feel that this permit is not doing enough to minimize take or to avoid jeopardy, they can sue in Florida State Court. I'm sorry, who can sue in Florida State Court? Plaintiffs, or I mean anyone, but can challenge an individual permit in Florida State Court. Florida's permits are subject to judicial review in Florida State Court. But the default of this program is that you're immune from take liability as long as this process is followed. But the process doesn't ensure that all the steps that you're supposed to take to get that protection from take liability happen. I beg to differ. It does ensure that. It absolutely does. It's a detailed process where Fish and Wildlife Service has three separate opportunities to comment on permits. Florida has to send permits to Fish and Wildlife Service, applications to Fish and Wildlife Service immediately after it receives them. Fish and Wildlife Service can comment at that time. Fish and Wildlife Service can also comment during the public notice period. And Fish and Wildlife Service can comment through EPA. Florida says we disagree with your comments. What happens? Florida may disagree, but Fish and Wildlife Service's conclusions are determinative. That conclusion... No, Florida can still issue the permit. Then it would be in violation of the memorandum of agreement, but more importantly with Florida's rights. Because Florida's regulations specifically say that no permit shall be issued that jeopardizes the continued existence of endangered or threatened species or results in the destruction or adverse modification of habitat. And that compliance with any requirements resulting from technical assistance by the Fish and Wildlife Service shall be determinative for purposes of evaluating violations. And that's Florida Administrative Code 62-331.0533. So taking your... Say Florida just doesn't abide by it. It's a hypothetical. What would happen then? Abide by a comment from the Fish and Wildlife Service. Then Florida would not... A couple of things, Your Honor. Florida would not be in compliance with its own regulations, with its memoranda of agreement, and with the biological opinion. So as to that individual permit, if there's an aggrieved party, they can challenge the permit in Florida State Court under the Florida Administrative Procedure Act and say, this permit is arbitrary. Who would challenge that? Excuse me? Who would challenge that? I think an environmental group, a plaintiff who says, I go here, I reparate here. I don't think this is protective enough. The vision is not that Florida's permits will never be subject to suit. Congress envisioned that the state permits would be subject to suit, but in state court. So Florida doesn't comply. Plaintiff sue. And they say, look, Florida didn't comply. And that is a plain violation of Florida's regulations, not to mention the biological opinion and the memoranda of agreement. But also, if Florida is not complying, then EPA would have a basis to withdraw the program. Part of what Fish and Wildlife Service relied on in the biological opinion is EPA's ongoing oversight authority over the program. So Judge Moss felt that this program, which relied on the decision in cooling water, which in turn relied on, I think it was in the 11th Circuit decision, felt that those decisions did not, well, the cooling water was inconsistent with the statute and regulations and that the 11th Circuit decision didn't really support this program either. This is at, you know, around 1349, 50, 51, pages 66, 69 or so of the opinion. Tell me how the district court was wrong in its analysis of the statute. Yes, Your Honor. So the district court erred because the Endangered Species Act says that you have to do a biological opinion, you have to ensure that you'll avoid jeopardy. And that's what Fish and Wildlife Service did here. And the Endangered Species Act says you have to rely on the best available science. And Fish and Wildlife Service said, we can't know, we don't know. So the best available data and science that we can rely on is a process here. And the Endangered Species Act doesn't preclude that. And Fish and Wildlife Service issued a biological opinion. It analyzed, do we think there will be take? And it said, yes. And under the Endangered Species Act, you have to issue an incidental take statement if you think there will be take. Judge Mosk said that he didn't think cooling water intake was a, he distinguished it on the basis that it involved a regulation instead of a program approval, as we have here. But we think that was error. First, the services regularly issue biological opinions without engaging in rulemaking. And they act in accordance with those opinions, as do the agencies and applicants subject to them. Second, the record contains ample evidence of binding commitments, including memoranda of agreement, Florida's regulations, as we discussed in reading the statute and what it requires, particularly in harmony with the Clean Water Act. So your friends on the other side say, you say it was impossible for the Fish and Wildlife Service to know what the impact would be. But apparently there is a sort of a robust history of approvals under the Clean Water Act by the Army Corps of Engineers. And there's plenty of data and information about which species are, have historically been implicated by some of these acts and the types of actions that were, have been submitted for approval. So why doesn't that undermine your argument that there was no way of knowing? For a couple reasons, Your Honor. First of all, the Fish and Wildlife Service evaluated the data. It looked very carefully at the past, so at the time, the past five years of permitting data from the Army Corps of Engineers. And it said this, this helps us understand the types of permits we might see and helps us understand whether this process is structured sufficiently to be protective. But Fish and Wildlife Service, this is a one-time approval into perpetuity. And Fish and Wildlife Service said we can't know forever how many permits might be issued, what types of activities, what the take might be in all the different assumed waters in the entire state of Florida. And frankly, Fish and Wildlife Service also acknowledged we don't know what species might be listed 15 years from now. There could be different species listed. So it needed a process that would work long-term into perpetuity. And Judge Moss said, well, they could look at the core data and say, here's a take limit for one species for a year. But that's not adequate for a number of reasons. First of all, the take is supposed to be incidental to the activity. Under the Endangered Species Act, you say, what is the activity that we think is going to happen? Okay, what is the, how do we minimize that take? What is incidental to that specific activity? The Endangered Species Act doesn't say, let's say how many animals we can kill every year before we cause jeopardy, no matter what. You're only supposed to do take incidental to the And so that's what Fish and Wildlife Service was saying, we're going to look at every individual activity. Right. And I guess the whole purpose of that is you've made a no jeopardy determination. It assumes a certain amount of incidental take. And there's a provision that says, if it turns out your incidental take is higher than what we expected, there's a re-triggering mechanism where you have to consult again. And this incidental take doesn't include anything like that, and therefore doesn't fulfill the purpose of the incidental take statement, does it? It does, Your Honor. You re-initiate consultation. So to your specific question- What's the trigger for re-initiating consultation? So Fish and Wildlife Service is going to set a limit for every individual permit that will cause take. Some won't, and with some, they'll require measures to prevent any take. But for those that will, Fish and Wildlife will set a limit. And under Term and Condition 9 of the Biological Opinion, if that take limit is met, then Florida must reopen the permit and go back to Fish and Wildlife Service. It's an incidental take limit or a take limit? All the permits here are only allowing incidental take, take that is incidental to the activity. None of these permits allow- So I guess the question is, then, I guess normally, wouldn't that be under Section 10 of the Endangered Species Act, that each individual permit would be subject to scrutiny? I don't think so, Your Honor. I mean, if a federal agency had issued the permit and they said, you know, your take limit is five eastern indigo snake, and the federal agency said, oh, we've hit five, you go back to the Fish and Wildlife Service and you talk to them. And here, what they're saying is- And I guess what's odd, though, is usually the consultation is with the agency under Section 7. And so, usually, agency wants to take some kind of step or conduct, and it might affect any endangered species. They have to go through this consultation. And you're trying to take that process, which is about agency action and agency consultation, and you're trying to, it seems, shoehorn that into individual permits and letting individual permits, which usually would be evaluated under Section 10 on a case-by-case basis. But you're trying to get this broad take liability immunity from Section 7 and then shoehorn it or apply it to the individual permits, which should be going through a more extensive process under Section 10. I disagree, Your Honor. I don't think there is a usual in- Well, the purpose of Section 7 is for agency action, not individual permittee action, correct? The purpose of Section 7 is to ensure that agency action is authorized, conducted, or carried out. It applies to agency action. And EPA was taking an action here. No, I understand. But then you're taking that sort of process, it's a Section 7 process, which addresses agency action, and you're trying to find blanket take immunity for individual permits down the line. Ordinarily, wouldn't they be subject to Section 10 review, which is much more, I guess, thorough? A couple of responses, Your Honor. First, I beg to differ that Section 10 is more thorough than what we have here. But, and two, only three states have assumed 404 permitting authority, so I don't think we have an ordinarily. My understanding from the Fish and Wildlife Service is that none of the New Jersey permits have gone through Section 10, the Section 10 process. And my understanding is that in Michigan- Did they go through the Section 7 process? The permit applications in the other two states, did they go through a consultation and a Section 7 process? Because my understanding was the government had taken the position that these are not discretionary permits, so they normally wouldn't have gone through Section 7 analysis, except Florida asked them to make it discretionary so that they could go through this process and get this approval. So there's a couple pieces there, Your Honor, that I want to unpack. First, to the question about New Jersey's program specifically. There's a memoranda of agreement between New Jersey- I think it's the New Jersey Department of Environmental Protection and the Fish and Wildlife Service, and try to minimize and prevent any incidental take from the permits. But when New Jersey applied to take over the permitting process from the Army Corps, was there a consultation under Section 7? Yes, Your Honor. There was a consultation. For the permit application? For the permitting? Yes, Your Honor. It was informal consultation, so there was not an incidental take statement because there are many fewer listed species in New Jersey than in Florida. It's at JA2690, but it's the letter from the Fish and Wildlife Service, but basically at JA2690, which is in Volume 9, New Jersey said, we're going to work, we're relying on this memorandum of agreement. There was a no jeopardy determination? Yes, yes. And we're going to work, we're going to implement this memorandum of agreement to ensure that protective measures happen and take is avoided altogether. But you can't avoid take altogether in Florida. But just to make sure I understand you, you're saying that when the state of New Jersey applied to take over the permitting process under Clean Water Act 404 from the Army Corps of Engineers, they submitted an application to do that. And there was a formal consultation or a consultation under Section 7 of Endangered Species Act, and there was a finding that there would be no jeopardy to species? Yes, Your Honor. I thought you had to have an ITS if there's no jeopardy to species. You have to have an incidental take statement if you think there will be take. In New Jersey... They thought there'd be no take in New Jersey? Yes, Your Honor. They thought there would be no take in New Jersey. For example, the letter from the regional director of the Fish and Wildlife Service says, coordination under the memorandum of agreement is designed to eliminate adverse effects to listed species and designated critical habitat. It then goes on to say, when this coordination process fails to eliminate take, the applicant must seek authorization under Section 10. So in New Jersey, they anticipated that they would be able to... And you have to seek authorization under Section 10. Which they have never done, is my understanding from Fish and Wildlife Service. But I guess the point is, that is a protective measure that makes sure the Endangered Species Act will be followed. And there's nothing like that in the Florida plan. In the Florida plan, there isn't anything like... So in New Jersey, they said, we don't think there's going to be any take. We're going to avoid it, which you can do in New Jersey. There's just many fewer listed species. But just in case, we would go under Section 10 of the Endangered Species Act. The Florida plan, nowhere in the Florida plan does it ever say there's going to be conformance with the regulations that interpret the Endangered Species Act about what you need in an incidental take statement. I beg to differ, Your Honor. Florida's memorandum of agreement with Fish and Wildlife Service... I thought you did agree. You just said, substituting a process that's adequate. You agree that it's not going to go through all the steps that's required by regulation or statute for a take state. You say it. I thought your position was, they don't need to do that because they couldn't do that because they don't know. And the process is adequate. I thought that was your position. Our position is that they're relying on a process. And that process will include the steps when with each individual permit, the process will include the steps that you would have under Section 7. So for example, Fish and Wildlife Service said, we're going to do this process. We're going to look at the action area. We're going to look at the effects. We're going to look at cumulative effects. We're going to look at other actions in the area that might affect species. We're going to look at the amount of take. We're going to assess whether that will cause jeopardy. We're going to require mitigation measures to minimize, to avoid take. And if not, we can't avoid it, minimize it. We're going to look at the status of the species. So the process that Fish and Wildlife Service laid out involves the same analytical rubric that you would have under Section 7. We acknowledge it is not Section 7 because Florida is not a federal agency, but it involves the same analytical. So if these things are not complied with, and there's a state in Florida court, which you indicated was the remedy, the suit in Florida court, would that be about Florida is not complying with the MOU? It wouldn't be actually to vindicate the standards of the Endangered Species Act, correct? Because that's a federal statute and you're not doing that in Florida court, are you? I think the suit in Florida court would be you're not complying with your Florida regulations and you're not complying with your Florida laws. Florida's regulations say that. But how does that vindicate the interests of the Endangered Species Act? Because the Endangered Species Act is about avoiding jeopardy, and they have a process here to ensure that every single state permit avoids jeopardy. And then if it doesn't, you say you can sue in Florida court. But what you can sue in Florida court for does not involve vindicating the Endangered Species Act. Well, Florida has adopted the same definitions of threatened and endangered species and jeopardy. So there's no to comply with the Endangered Species Act. Florida's regulations say that we have to comply with Fish and Wildlife Service's determinations in the technical assistance process. And we cannot issue any permit that jeopardizes the continued existence of endangered threatened species. There's no way to vindicate the actual Endangered Species Act. I do not agree. Florida courts can do that? Because Florida has adopted these regulations and the standards. Florida law has incorporated the same definitions. And in Florida state court, you can say you aren't complying with the terms of the biological opinion issued under the Endangered Species Act. You cannot directly vindicate the Endangered Species Act in Florida court in one of these suits that you propose are an adequate remedy. I'm going to have to disagree, Your Honor. I disagree because a plaintiff could say, you're not complying with the Florida regulations. You're not complying with this process. You're not complying with the biological opinion. And these permits or this permit is causing jeopardy or it's not doing enough to minimize case. You didn't adopt the Fish and Wildlife Service's measures. And let's say that a plaintiff says Florida has done this. I'm so frustrated. They can also petition EPA and say you need to withdraw Florida's program. So there are avenues for relief. Can I ask you, am I correct that the record reflects that somewhere between 90 and 98.6% of the Florida's Clean Water Act permits do not involve incidental case? The majority of them do not. I don't know the specific percentage, Your Honor. A large percentage of these permits issued will have no effect. Absolutely true. Okay. One final point, Your Honor. The United States, we think Florida raises valid points that plaintiffs lack standing. And we would like to join their standing argument and I'll defer to Florida to present that further. We'll give you a couple minutes to reply, Mr. Street. Thank you, Your Honor. May it please the court. I would like to start with some of the questions that have been asked and then circle back to standing because I do think that standing is lacking under Crow Creek and Waterkeeper. But to go directly to some of the questions. First, Judge Wilkins, I think, put his finger on it that Judge Moss and my friends on the other side are directly and unapologetically asking for a circuit split with Waterkeeper, the only on-point case that addresses this type of programmatic consultation where it's approval of a federal program that will be carried out by states issuing permits and doing a species-specific analysis at the state permit level. And turning to Judge Pan's questions, I want to start where you, Your Honor, left off with the question about the Florida suit. And we very much agree with Ms. Jaffe that if you look at, for example, Florida Administrative Code 62-331.053, it directly incorporates the very Endangered Species Act standards and says Florida may not issue a permit that could cause jeopardy. That is stripped directly from the Endangered Species Act. Florida cannot issue a permit that fails to incorporate Fish and Wildlife Service or NMFS minimization conditions. That's the exact same thing that happens in the Section 7 process. The Corps consults with the Fish and Wildlife Service. It consults with NMFS. Those agencies give the Corps minimization recommendations. And the Corps, in fact, can either take them or not take them. Florida has to take them. So those ESA substantive standards are hardwired into the regulations. And it's not only in the Florida regulations that are enforceable in Florida court. I would urge the court to take a look at page 2601, which is the biological opinion, and page 2668, which is later in the biological opinion. At 2601, it says Fish and Wildlife Service reviews each permit, quote, to ensure compliance with the Endangered Species Act. So Fish and Wildlife is directly applying ESA standards in its permit-specific analysis? I guess the issue here is, yes, perhaps some of the steps that Florida would take would be protective of endangered species. And to take a step back, we're talking about a statutory provision in the Endangered Species Act that talks about whether an agency is complying with the make a no-jeopardy determination and then an incidental statement. And it seems, I don't think there's a dispute that these specific steps have not been taken in this case. And what is being argued is that it is reasonable to not take those steps and substitute those steps with a process that would be protective of endangered species. But I'm just having trouble seeing why that's allowed. Sure. A few points on that, Your Honor. First of all, I think our brief walks through the textual analysis of why what the agencies did here does comply with the strict terms of the statute. And that's for a couple of reasons that the text gives us. The text uses very broad terms like specify the impact on the species, detail the effects on the species, and also very broad terms. And all of those have to be done in light of the best available data there. So it's a very flexible standard. But isn't it true that in this program, your position is we couldn't do that because we're talking about a bunch of permits in So we don't know what the exact effects are as we sit here today. And we don't, the best available data doesn't tell us that. And so we can dispense with those requirements. And instead, in the future, we will take care of this. That is not our argument, Your Honor. And I think our argument is exactly what the Second Circuit said in cooling water, which is that the process does specify the impact on species. Because our goal, and I think it's important to step back, as you suggested, and look at what the goal of that Section 7 analysis is, is to determine whether jeopardy will occur as to any particular species. Now, as Your Honor points out, in the ordinary context, that's easy, right? You've got a discrete permit, it might affect one or two species. The discrete agency action. Yes, a discrete agency action, which could be like a federal pipeline or anything like that. It's in one area, they look at the species, they try to evaluate the effect, they give an incidental take limit. But that's not the only type of action that's covered by Section 7. Section 7 action is defined in the regulations to also include authorization of a program. So when you are evaluating the effects of a program, and you're detailing the impact on species of a program, you are, by definition, not going to be able to look at the species-specific level when it's a program that encompasses an entire state, 200 plus species, scores of different types of permanent activities, running from mining to residential construction. So the type of analysis that you do has to mirror the type of action that's being analyzed. I think that's what the Second Circuit said. But it wouldn't be impossible, for example, to have a program that says, we will approve Florida taking over this permitting process, and any individual permits will be subject to Section 10. So let's talk about that. I think that was a theme in Your Honor's earlier questioning. First of all, the first question that has to be asked is, is there an agency action? I think So once you get on the Section 7 track, there are certain things that you have to do. One, you have to analyze the effects of the species and determine whether or not there's jeopardy. We found no, the agencies found no jeopardy here. But if you find effects, potential adverse effects and incidental take, then you have to issue an incidental take statement. You just simply have to do that. So everybody agrees here that you have to go onto the Section 7 track at the outset. I think where my friends differ is that they want to cut out that incidental take statement and say, no, go ahead and go down the Section 7 track. And Your Honor, I want to point out that I think, as Ms. Jaffe mentioned, at the broader level under both, under the New Jersey program, New Jersey went, it actually did a consultation. It was just an informal consultation. So there's no dispute that when the agencies are approving an EPA assumption, absolutely has to consult and take into account species. The question is whether you go to the formal consultation because there are going to be effects. Now, I think the point was made about Isn't it correct that they could approve New Jersey taking over that permitting system and say that there's no jeopardy because they know that individual permits are going to have to comply with Endangered Species Act? Well, I don't think that's why they approved a no effect determination in New Jersey. I think it was, we don't have a lot of record evidence on it, but I think it was because there were Incidental take liability protection in New Jersey. Correct. Correct. But that's because, again, they did not make a determination that there would be incidental take. Right. So let me just back up just for a second. When the Army Corps has been running this program, right, previously, it's been issuing the Section 404 permits. As Judge Henderson alluded to, the record shows that when the Army Corps has been issuing these permits in Florida, 7% of them do involve incidental take. So when Florida is taking over this program, it's not some gerrymandered alternative route. When Florida is taking over the program, it's also going to have incidental take because they're going to be applying the same standards. So because Section 7 requires an incidental take statement, if incidental take is to be anticipated from the federal action, it has to have an incidental take statement. Now what we did, and what we did in collaboration with the agencies, is we built in all of those same Endangered Species Act standards, and we built in incidental take limits into the state issued permits. And what the Florida regulations say is that Florida will send these permits to Fish and Wildlife Service, and Fish and Wildlife Service will establish for each permit an incidental take limit. And that is going to be binding on Florida through a suit in Florida state court. And so it's exactly, it's operating exactly the same as it would if the Corps consulted with Fish and Wildlife, issued the permit, and it has an incidental take statement. The only difference, incidental take limit, the only difference is it's going to be enforceable in the first instance in Florida state court, instead of in Florida federal court. But that's not, that's not a bug. That's a feature of the Section 404 program. Congress wanted states to take over the 404 program. And if you have states issuing the permits, inherent, instead of going through Section 7 on a permit by permit basis, inherent in that is that enforcing those standards is going to be done in state court, not in federal court. I think the bug is that the Section 7 consultation addresses the EPA's approval of this whole program. And the bug is that EPA's approving this program, which includes approving state-by-state permits, or at least making them eligible for the take liability protection. And then you're saying later on down the line, Florida's going to do all these things that's going to make it okay. But the bug in the system is that Section 7 is supposed to deal with EPA and EPA's conduct in approving this. And EPA isn't complying if it's relying on a process that it can't really control anymore. It's going to go to a state court. It's just no longer part, I mean, I know you're going to say Fish and Wildlife Service is going to be, you know, involved, but the bug in the system is this is a process that's supposed to address agency action. And all the action is happening at the state level with individual permittees. And it's just not, it doesn't seem to me that this process is designed to address state-by-state permit case statements, etc. Like that's just not what's contemplated by an overarching statutory structure and scheme that's supposed to protect endangered species at the federal level. Your Honor, I don't think anyone disputes that states can take over permitting that would otherwise be done under Section 7. That means it has to be outside of Section 7, right? Absolutely. And there have to be compliance with the ESA independently. Right. Without having it all in one program. Right. And that was exactly the same as in cooling water where you had the states having to issue the 402 permits. And these very same plaintiffs were there in front of the Second Circuit and made that exact same argument. And the Second Circuit said, well, when the states take over permitting, of course, it's outside of Section 7. So we look at the process and make sure that the technical assistance process is mandatory and hardwired into the biological opinion, that it was the basis for approving that state program in that case, and that it would be enforceable. And because you have to have these permits issued by the states, that's ultimately the question. Is there protection, like, I guess, prospective protection from take liability in the cooling water instance? Yes. Yes. It's exactly the same. In fact, this was quite self-consciously modeled on the cooling water biological opinion and the incidental take statement because that was... Was that case, though, about a different section of the Clean Water Act? That's my recollection. Yes. It was about the regulation of cooling water intake structures and the parameters of what those had to have in them and how protective they had to be. And then the states would issue the permits and do the permit-by-permit species analysis with the permit-by-permit take limits in those. So it's really... Yes, it's a different statute. It's a different program, but it's the same idea of a federal authorization that will be carried out through state permitting. In fact, not just any state permitting, but permitting under 402, which is, of course, the sister provision of 404. And I think, Judge Pan, your question was getting at, well, Section 10, isn't that the right way to go? And I think if you think about what that means, then it would be a massive disincentive for states to ever go through the 404 assumption process because they wouldn't be able to offer the same incidental take protection that the federal government would be able to through the Section 7. I don't think the 404 permitting process is intended to address the Endangered Species Act. Oh, Your Honor, I would strongly disagree with that. I would look at 40 CFR 233.23a. But I mean the permitting, like taking it over. I mean, it just seems like an underlying assumption, correct me if I'm wrong, that you're making is that 404 is a way for us to more efficiently comply with the Endangered Species Act for all of these permits. Of course, all the permits have to comply with Endangered Species Act, but isn't the default that we have two independent statutes here, the Clean Water Act and the Endangered Species Act, you've got to comply with both of them. No. You're trying to do something to make it more efficient. We're going to make one program that deals with all of this in one program. No, Your Honor, I disagree with that. And I don't hear my friends on the other side to disagree with the concept that a Section 404 assumption requires EPA to consider whether the state assumption program will comply with the Endangered Species Act. Then why is it, maybe you're not the right person to this proceeding, the government considered this, the 404 permitting a non-discretionary act, which wouldn't be subject to any of this, Section 7 Council. Right. So non-discretionary is a slightly misleading term in this context. I think the court should look at the Home Builders case, of course, which talked about this and found that Section 402 did not require consultation with Fish and Wildlife Service. And the reason there is because Congress gave nine requirements that states have to meet in order to comply with Section 402 and take over the permitting of point source discharges. And Congress said, the court and Home Builders said, we can't add on a 10th, which is consulting regarding species. But under Section 404, a state cannot assume control of Section 404 permitting unless it shows that it has a program that can comply with the Section 404b1 guideline. In other words, it has to show that it can do the same thing that the court does when it comes to protecting species. And I think, I think 40, I believe 40 CFR 233.23a spells that out most expressly. It says the states have to show that they're able to ensure compliance. And if you look at, for example, the withdrawal of assumption authority that EPA can do, one reason is that they're failing to protect species, the states are failing to protect species. So if I could, then I would turn to standing briefly. And I think Crow Creek and Waterkeeper are the key cases here. And they stand for the proposition that when the federal government authorizes the states to run a program under federal standards, federal law standards, or under ongoing federal oversight, it's going to be extremely difficult for a plaintiff to ever show standing. And that's exactly what we have here. As I detailed earlier, the ESA standards continue to apply through the Florida consultation with the Fish and Wildlife Service. And so for the plaintiff's interest to ever be injured, and of course their interests are viewing species and species, they would have to show that take, incidental take would be more likely to occur under Florida's program, substantially more likely to test for procedural injury, substantially more likely to assume that they're correct for purposes of standing. And they're saying that your program is less protective of species. So there'll be few of them that affects their interest. So two answers to that, Your Honor. I think that their merits analysis that the court has to assume for purposes of standing is exactly what Judge Moss found. He did not find his basis for rejecting the biological opinion was not that the Florida technical assistance process was less protective. His basis was that the biological opinion needed to be more detailed with respect to species, species specific analysis, projecting it decades into the future, that there needed to be take limits in the biological opinion itself, and that the technical assistance process itself was just not a lawful way to satisfy Section 7. The merits of the case are not about whether the technical assistance process is good or bad or equal to Florida law. And even if that were part of their merits case, I think Crow Creek answers this because the plaintiffs there made the exact same argument. They said the federal government is just not going to be able to enforce the law as much. Federal law will not apply with the same force on those transferred lands. And the court just said that's not what the statute says. So to the extent the court thinks it has to look at it, I've given all of the citations that say this program complies with the substantive standards of the ESA and the Clean Water Act. And not only that, not only those substantive standards continue to apply, but you have two federal actors ensuring that they continue to apply. Every permit goes to Fish and Wildlife Service to ensure no jeopardy and to give minimization measures. And even if Fish and Wildlife Service were to somehow drop the ball, even if Florida were to drop the ball on its own duty to comply with the Fish and Wildlife Service recommendations and to ensure no jeopardy, we haven't really talked about EPA. But EPA has an independent statutory and regulatory duty to review these permits and object to them if they would cause jeopardy, if there's a risk of them causing jeopardy. And if they object, Florida cannot issue those permits. Those permits have to go to, Florida has to either resolve EPA's objections or those permits will get transferred right back to the court and will go back to the old Section 7 process for that permit. Even if all of those processes broke down, the permit will not issue until a Florida administrative challenge is heard. So plaintiffs would have the opportunity to go into court, point to that federal Florida regulation that I quoted, and say to the Florida court, this permit will cause jeopardy. It does not include the Fish and Wildlife Service minimization measures. They would have a lockstitch case that that permit would violate Florida law and that permit would never take effect and you would never have the increased take that the plaintiffs are worried about. And not only that, they can build their own administrative record in the Florida proceeding. They can build the record. It's not limited to what was before the permitting agency. So I think when you walk through all of those steps of contingencies that would have to break down before you would ever have a permit issued, it is hugely speculative. And so I think we're in the same position where we were in Crow Creek, where this is really, there's no standing to challenge the approval of the program. And in Waterkeeper as well, which of course was a state coal ash permitting program, and the court said it's speculative to think that a coal ash permit will ever be issued in a quote environmentally friendly way than it would have under the federal system. That's the standard. It's totally speculative here as well. So the remedy, we've talked a little about what's the remedy if the process breaks down. Number one, EPA can federalize the permit. Number two, you go into state court and enforce these same federal law standards. Number three, my friends could petition the EPA to withdraw the assumption of the program. It's not working like it was supposed to work. It's not protecting species. And that would be reviewable in this court as well. And finally, I would say at page 72, Waterkeeper suggests that there would also be a federal Endangered Species Act citizen suit against any actor who does not comply with the regulations issued pursuant to this program. So I think there is that backstop as well of getting into federal court. I don't want to wear out my welcome, but if there are any further questions. That should give you a couple minutes to reply. Thank you. Thank you, Your Honors. May it please the court. Christina Riker on behalf of the Environmental Affilies. I would like to start by addressing a few points that were raised during questioning of the other side and then move into our affirmative case regarding this illegal action. Yes, Your Honor. Standing here for plaintiffs was clearly established and found by Judge Moss. None of the factual findings that underlie that standing have been challenged by the other side. In reality, what happened here is that EPA approved a program that was fundamentally less protective of endangered species. And as long as that program operated as it was designed and approved, our members' aesthetic and recreational interests would be harmed. Although we were not required to do so, we even included in our declaration particular permits that were originally before the Army Corps of Engineers and then were transferred to the state of Florida after approval that would harm those interests in particular for the Florida panther and other listed species. And you're saying that factual findings that were made in the district court counter what your friend on the other side has made as far as the significance of the Coal Creek and the water keepers? Yes, Your Honor. One of the things that Judge Moss found in his analysis of standing is that the technical assistance process is willfully less protective than the Endangered Species Act because it does not, in fact, contain the particular requirements that were omitted at the programmatic level. For example, there is no requirement to analyze baseline status of species. There's no requirement for Fish and Wildlife Service to analyze the effects of individual permits. Fish and Wildlife Service is not required to actually create incidental take limits only to quantify take. And there is no requirement even if all of those things happen and there is a permit condition that creates a take limit. Permittees are covered under the ITS because there's no terms and conditions that govern their behavior. Under 16 U.S.C. 1536-0, that activity would still be authorized and covered under this incidental take exemption. And so as long as that program operates as it was designed without any intervening speculative activity, these harms will occur. How did the declarations you just mentioned concretely illustrate this? So for the declarations, at JA 315-318, for the Conservancy of Southwest Florida, identified a permit known as Belmar, which was originally going through a Section 10 permitting process in Florida for an Army Corps permit, was transferred to the state of Florida, and those developers abandoned Section 10 in lieu of the technical assistance process because it was easier for them to go through. And so our declarant identified her interest in panthers that regular this area, and the harm that would occur at this development went forward with the destruction of not only primary panther habitat, which is the most essential to their survival and recovery, but likely incidental take of panthers through getting hit by cars because of the increased traffic that would come along with this development. This project was essentially building a new town in Southwest Florida, and so the size and scope of that activity would lead to incidental take of panthers. There's also additional examples that I can point to at JA 303. I'm sorry, so it's the idea that there would be incidental take, and under the Florida program, they would have, I guess, protection from liability, whereas if they'd gone through Section 10, they wouldn't until they'd gone through the whole thing. Yes, Your Honor, and also there was likely more take that would occur, more harm that would occur under the state program because they wouldn't have to go through the protective process that the Endangered Species Act creates, which likely would lead to a more protective permit setting aside additional areas that could not be developed, creating incidental take limits, creating traffic overpasses to prevent panthers from being struck by vehicles, and those kinds of things that happen when the Corps is engaging in Section 7 consultation. Thank you. Turning to the merits, I want to start by just laying the groundwork on some of the discussion that was occurring about Section 7 versus Section 10. First of all, Section 7 consultation doesn't occur for every federal agency action. It's only when that action is and we agree that EPA's approval is a discretionary action for a 404 program. However... Why do you agree on that? Because for a long time, they had a long-standing policy that it wasn't, and it seems like they asked for it to be deemed discretionary in order to approve this program. Yes, Your Honor. Originally, so for example, in New Jersey, they did engage in Section 7 consultation. After homebuilders came out, EPA changed its position and said that it was no considering 404 approvals discretionary actions, and so it wouldn't engage in consultation. The reason that that is, I think, true based on the homebuilders' decision is in the 404 program, there is a requirement to ensure that no permit would jeopardize species, not that they comply with the Endangered Species Act, but they have to ensure that any state permit would not jeopardize listed species, and that's not present in the 402 program. As far as whether formal consultation must occur, and that is where there is actually a jeopardy determination, that is where an incidental take statement is created, that is where a biological opinion is created. That only happens if Fish and Wildlife Service concludes that federal agency action is likely to adversely affect listed species. When New Jersey was going through its process, EPA initially concluded that there was not likely to be an adverse effect to listed species. Fish and Wildlife Service disagreed, and they went through a process to create the protections that are in place in the MOU for New Jersey. Those protections include Fish and Wildlife Service has to make effects determinations. They have to make jeopardy determinations. If a permit is likely to adversely affect species, EPA has to object to that permit, and if the state is not able to overcome that objection, the permit is then sent to the Army Corps of Engineers for processing, which means that it engages in Section 7 consultation. If there is any dispute between the state and EPA on jeopardy or take, EPA must object to that permit as well. If it is not resolved by the state, it must go to the Army Corps of Engineers. It's also true that Fish and Wildlife Service said that any incidental take that would occur in the New Jersey process must be addressed by either Section 7, if it's issued by the Army Corps of Engineers, or through Section 10, if it is issued by the state of New Jersey. And so because those protections were in place, Fish and Wildlife Service concluded there was not likely to be adverse effects. They did not need to issue a biological opinion. They did not need to issue an incidental take statement at the programmatic level. And one thing I will note is that in Florida's request for a limited stay before the district courts, they stated that they could apply in New Jersey's health program in Florida. Second, on to what happened here. So they determined that EPA's action was likely to adversely affect listed species. However, they did not do any of the analyses that are required to underlie a no jeopardy decision. The regulations are very clear that Fish and Wildlife Service must analyze the baseline status of species, add the effects of the federal agency action to that baseline to determine if there is jeopardy. They did not do that here. In addition, Fish and Wildlife Service must first determine that it is reasonably certain that incidental take is likely to occur, not that they think that incidental take is going to occur, but that it's reasonably certain before they can issue an ITS. Here they said they did not have sufficient data to know what would happen under the state program, but they still had to have concluded that it was reasonably certain that take would occur. Then they decided to issue a broad incidental take statement that authorized an unlimited amount of take for the state program as long as it lived. Congress never intended the Endangered Species Act to operate as this kind of a blank check. Second, the Endangered Species Act is designed to accommodate and address the exact uncertainty that occurs in most programmatic consultations. It requires the wildlife agencies to do an initial analysis based on the best information that they have and not the best possible data that could exist. They did not need to know all of the impacts that could possibly occur for the life of this program in order to do this analysis. They just had to do the best they could. Based on that analysis, there would be also a requirement for them to reinitiate consultation if new information comes to light 10, 15, 20 years down the road that shows that this analysis is no longer accurate. For example, right now, development pressure is very concentrated in Southwest Florida. That's the last remaining home of the Florida panther. Right now, if they did this analysis based on historical data, they could show that, okay, in Southwest Florida, we know the panther is going to be impacted. We know there's only 230 of them left, and we know that this is their last remaining occupied habitat. We can take that information and say, historically, these permits show that on average, three panthers are taken a year. That seems like a reasonable amount of take that we can create a take limit for. Or we know that annually, 30,000 acres of this habitat are destroyed. Let's think about what that would mean if that continued for 20 years down the future. They didn't do that analysis here. There's no actual protection for the panther under the state program. It allows the piecemeal destruction of our habitat that the ESA was designed to prevent. And so they say that they're going to have incidental take limits in each permit. And I guess, doesn't that end up with a higher aggregate amount of incidental take? Because at each permit, they have to allow somebody to have some incidental take. The numbers are going to add up higher, aren't they? Yes, Your Honor. First, I will say that the technical assistance process does not require them to create permit-level incidental take limits. It does only require Fish and Wildlife Service to quantify for an individual permit, which they have done. It doesn't require that to be a binding limit on the permittee. On the second point, this is exactly the situation that the district court in D.C. dealt with in Brownlee, which addressed the Army Corps' decision to issue a nationwide permit in Florida that affected the panther, but they failed to do a programmatic consultation. And the court recognized that a comprehensive programmatic consultation is necessary to avoid this kind of a piecemeal destruction, this death by a thousand cuts for the panther. Another point I'd like to turn to now is about the technical assistance process itself. Because in reality, when you look at the language of the technical assistance process, it doesn't include the things that they fail to do at the programmatic level. As I said, there's no baseline analysis. There's no requirement to use the best available science. There's no requirement for them to do an effects analysis. And so even if it is binding on Fish and Wildlife Service, it doesn't actually stand in for adequate programmatic consultation. And so that means that consultation did not occur at the programmatic level, and it would not occur at the site-specific level. And finally, I'd like to address cooling water. So first of all, as you asked Judge Wilkinson, we agree that cooling water was wrongly decided, but we don't think the court needs to reach that issue. It was also decided under fundamentally different factual circumstances. It was not about the approval of a state Clean Water Act program. It was about EPA promulgating a rule intended to protect fish species from harm that occurs at 402 discharge point. Second of all, they didn't have data in that context like they do here. Those programs had long been assumed by the state, and so there was not Section 7 consultation happening at the permit level like there is in Florida. Also, the state programs do not have a requirement to consider species, as we said, in the 402 program like they do in 404. So the states were not collecting this data. So there was actually a vacuum of information that was present in cooling water that is not present here. And third, clearly in that situation, the technical assistance process was part of the preamble and the regulation that EPA issued. And that meant that, number one, it was appropriately considered by Fish and Wildlife Service as part of its jeopardy determination because it was part of the underlying program. And it meant that it was appropriate because it was enforceable under the Endangered Species Act itself. Neither of those things are true here. And so we do think that you can distinguish cooling water without having to reach this question of whether to create a circuit split. Thank you. Thank you. We ask that you affirm. All right. Ms. Jackie, why don't you take two minutes? Thank you, Your Honor. Just a few points. First of all, the technical assistance process will look at the same types of information that you examine in the Section 7 consultation process, such as the project area, the effects, cumulative effects. That is outlined at JA2621 to 26. Two, the technical assistance process will quantify take if there will be any incidental take with individual permits. That's outlined at JA2670 to 71. Any permit that causes incidental will be reopened if the take limit is exceeded. That's at JA2673. Permittees are only covered if they comply with permit conditions. That's outlined at JA2671. If they modify their project in some way, they are not covered for any additional take. That's at JA2624. Finally, I want to note one question that Judge Pan had that I didn't answer when I was up before. There are circumstances where reinitiation of consultation would occur. For example, if Florida wanted to modify its program, it needs EPA approval for that. If the modification would affect species in some way, then Florida would have to ask EPA's approval, and EPA would have to go back to Fish and Wildlife Service. Finally, I just want to say that Fish and Wildlife Service relied on a robust process that satisfies the Endangered Species Act requirements and has been upheld by the Second Circuit. This court should uphold that process here and reverse the district court. Thank you. Thank you, Your Honor. I would like to note on cooling water that Judge Moss only found one distinction there. Otherwise, he openly admitted he just disagreed with cooling water. The distinction that he relied on is that in cooling water, the technical assistance process was part of a federal regulation. But if you look at cooling water, the reason it found that the technical assistance process was binding and enforceable is because it was the basis of the agency action and because counsel said in open court that it was the federal government and state considered a binding on them. Both of those things are true here. The EPA and Fish and Wildlife Service only approved Florida's program because this technical assistance process was hardwired into it and was the way to avoid jeopardy and to minimize incidental take. And second, you've had the government counsel here. Government counsel and district court quite clearly said, we consider this binding. We are going to apply federal standards. We will not let a Florida permit issue that violates it. So I think that you would have a circuit split. And again, you can read cooling water and almost every single argument was made by the same plaintiffs and rejected, including deference to the scientific determination that it was impossible to quantify take on a program wide level. Turning back to standing for a minute, I think my friend talked about the merits of their claim that Judge Moss found that the technical assistance process was less protective. He was not finding it less protective of us as a substantive matter. He did not find that Florida and the Fish and Wildlife Service would not enforce federal standards or that they were not binding. He just found that it did not have the things that a section seven formal consultation would require. Like each permit does not have a baseline effect analysis on the species. So I think that's number one. Number two is, even if you do think you have to consider whether something is a merits argument, I would urge the court to look at section 916 through 918 of Crow Creek. The plaintiffs there said, our merits argument is that under the federal statute, these federal cultural protection statutes will no longer continue to apply. And this court said that the tribes claim that federal enforcement will diminish is purely speculative. But when the, when the quote statute provides that the secretary will have an ongoing and undiluted role on the transferred land. So the court looked at a merits argument, just, it didn't let them have the law that they wanted to have when the binding documents said otherwise. If I could just correct one missed site in our brief that's material. My friends have also alleged a failure to consult with the national Marines fishery service. And on page 53 of our reply brief, we cited the page where the agencies did clearly consider indirect effects to downstream species and found that there would not be any effects, even in the waters that the core retained. We mistakenly cited that to JA 2156, but that quote is to JA 2159. And finally, on the section 10 point, your honor section 10 is a voluntary option. And it's a rarely used option. The comparison for purposes of standing should not be what protections would have happened under section 10, because that's not the status quo ante. The status quo ante, but the army core of engineers issuing permits under section seven, which we know do result in some level of incidental take. The only change here is that Florida is now going to be issuing the permits after doing the same consultation under the same standards. That should be the comparison for purposes of standing. Thank you.
judges: Henderson; Wilkins; Pan